NATIONAL CAN CORPORATION, Defendant-Appellant,

v.

Michael JOVANOVICH, Plaintiff-Appellee.

No. 3–885A212.

Court of Appeals of Indiana, Third District.

Feb. 18, 1987.

Rehearing Denied May 6, 1987.

Maurice S. Weigle, Laura A. Kaster, Joel J. Africk, Diana C. White, Jenner & Block, Chicago, Ill., Stephen M. Terrell, Ice Miller Donadio & Ryan, Indianapolis, for defendant-appellant.

Michael S. Bergerson, Kenefick, Gilmore & Bergerson, Michigan City, Anne Willis Reed, Milwaukee, Wis., for plaintiff-appellee.

GARRARD, Presiding Judge.

National Can Corporation (hereinafter "National Can") appeals an adverse judgment in favor of Michael Jovanovich (hereinafter "Jovanovich"), an employee who was injured while working for National Can. After receiving the verdict of an advisory jury, the trial court awarded Jovanovich $600,000 in compensatory damages and $275,000 in punitive damages. We reverse.

### Facts

Jovanovich was a machinist/millwright at National Can's LaPorte, Indiana plant. His duties as a millwright included welding, climbing and heavy lifting. In addition to his work as a machinist/millwright, Jovanovich was active in the local union and was a member of the union grievance committee.

On May 14, 1980, Jovanovich was assigned to carry a gearbox, weighing approximately 100 pounds, up several stairs and install it on a machine called a neckerflanger. Jovanovich injured his back during his attempt to carry the gearbox. This injury required that Jovanovich be examined by an orthopedic surgeon in LaPorte, Dr. Blair. On May 20, Dr. Blair examined Jovanovich and found that while his "clinical examination" was normal, Jovanovich was experiencing back pain. Jovanovich soon returned to work but was assisted by fellow workers in some of the heavier jobs.

In the summer of 1980, Jovanovich was placed on seven weeks of full disability leave at the recommendation of a LaPorte chiropractor. In addition, Jovanovich filed a claim for workmen's compensation for his back injury initially caused by his attempt to install the gearbox in May 1980. Despite his back pain, Jovanovich returned to work in the fall of 1980 and performed his regular duties as a machinist/millwright. Jovanovich produced evidence at trial to show that during this period he suffered continual back pain, weight loss and psychological deterioration.

In December 1980, Jovanovich was examined by a LaPorte neurologist, Dr. John Galea, who found Jovanovich's injury to be a muscle spasm rather than permanent spinal injury or nerve damage. After examining Jovanovich, Dr. Galea sent a letter to National Can recommending that Jovanovich avoid heavy lifting and pulling for at least three months (record, p. 260). Dr. Galea also suggested that Jovanovich be placed on "light duty" status. Having abolished any formal "light duty" status, National Can refused exclusive light duty work to Jovanovich and sent him home until he could perform his routine duties without restriction. National Can then sent a letter to Dr. Galea explaining that no light duty work was available at their plant, and requested a clarification of Dr. Galea's diagnosis and recommendations regarding Jovanovich's work restrictions. After some correspondence, Dr. Galea, in his December 22, 1980 letter, responded:

"I essentially and primarily concur with the diagnosis of Dr. Blair but I feel that to achieve proper recovery this patient should have certain limitations at work for a given period of time and when I am saying this I am not talking as a permanent disability.

Answering your specific questions, my Final Diagnoses are: 1) Injury to the dorsal superficial branches of the right T-8 and T-9 posterior rami, along with a degree of muscle sprain of the paraspinal muscles on that side. The patient can perform his regular job, he could lift up

weight according to his tolerance for pain. Provided that this limitation in activities are kept for a period of three months, he should have enough time to recover well.

As for your fourth questions, I don't think anyone can answer exactly how much weight he can lift and you must trust when he reports whether or not he has pain.

I am not declaring the patient disabled, but requesting common sense in limitation of activities for an acceptable period of time."

(Record, p. 260E). Shortly after National Can received this letter, Jovanovich returned to work pursuant to Dr. Galea's instructions.

On January 27, 1981, Jovanovich was assigned to dismantle an obsolete basecoater machine despite his objections to the assignment. As a result of his work on the basecoater Jovanovich experienced more back pain and was sent home because he could not continue his work on the basecoater. Several days later Jovanovich received a letter from National Can indicating that he must return to work or risk suspension or discharge from employment. Jovanovich returned to work and continued in National Can's employ until November 23, 1981. Jovanovich claimed at trial that during the period from February 1981 to November 23, 1981, he was assigned mostly heavy labor which caused his condition to worsen.[1]

On December 14, 1983, the Industrial Board of Indiana reviewed Jovanovich's claim which he filed for his 1980 gearbox injury. National Can and Jovanovich stipulated that Jovanovich had a 22% permanent partial disability. Based on this stipulation and additional medical evidence provided by several doctors who examined and treated Jovanovich after both the gearbox and basecoater incidents, the Board awarded Jovanovich temporary total disability.

Jovanovich then filed this action in LaPorte Superior Court against National Can alleging that National Can, acting out of

---

1. Jovanovich claims that National Can's actions were motivated by his filing grievances to prevent National Can from having machine parts made and repaired by outside contractors. (Record, p. 806).

malice toward him, wilfully, intentionally and wantonly refused to assign him to light duty work. Further, Jovanovich alleged that National Can knew that Jovanovich's performance of heavy work would cause further injury to his back. Hence, Jovanovich concluded, National Can intentionally injured him. The trial court agreed with Jovanovich and awarded him $600,000 in compensatory and $275,000 in punitive damages. The trial court, however, found in favor of National Can's set-off for sums already paid to Jovanovich under the Indiana Workmen's Compensation Act and under National Can's disability and medical insurance plan.

National Can now seeks reversal of the trial court's judgment and presents the following issues:

I. Whether Section 301 of the Labor Management Relations Act preempts Jovanovich's state law claim of intentional employer misconduct.

II. Whether Jovanovich's claim of intentional employer misconduct is within the primary jurisdiction of the National Labor Relations Board pursuant to Section 8 of the National Labor Relations Act.

III. Whether Jovanovich's claim of employer misconduct is "by accident" and thus within the coverage of Indiana's Workmen's Compensation Act.

IV. Whether Indiana courts have recognized an intentional injury exception to the Workmen's Compensation Act exclusivity provision.[2]

We affirm in part and reverse in part.

### Discussion

Initially National Can argues that Jovanovich's claim for intentional injury is, in substance, a claim alleging that National Can breached Article XI, Section 7 of the parties' collective bargaining agreement governing assignment of employees to light duty status,[3] and Article XV, Section 1 of the same agreement governing retaliatory work assignments.[4] Further, National Can argues, because these claims necessarily require substantial interpretation of the collective bargaining agreement, Section 301 of the Labor Management Relations Act[5] preempts any state law applicable to Jovanovich's claim for intentional injury. In primary reliance on *Allis-Chalmers Corp. v. Lueck* (1985), 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206, National Can urges this court to vacate the trial court judgment for Jovanovich.

### I. Preemptive Scope of Section 301

Two competing interests have shaped the doctrine of preemption. On one hand the United States Supreme Court has recognized that the broad powers which Congress has conferred upon the National Labor Relations Board to interpret and enforce the Labor Management Relations Act

**2.** National Can raised two additional issues, the first regarding whether Jovanovich's acceptance of workmen's compensation benefits in 1983 constitutes an election of remedies barring this state court action, and whether the case was tried under an assumption that an employer can be held liable for gross negligence. Additionally, Jovanovich challenged the propriety of the trial court's set off order. We find it unnecessary to address these issues in light of our holding that Jovanovich's claim was within Indiana's Workmen's Compensation Act.

**3.** Article XI, Section 7 provides:
"Aged or partially incapacitated employees who have two (2) or more years of continuous service with the Company will be given preference for placement by the Company to such light work as might be available and they are able to perform."
(Record, p. 1172B).

**4.** Article XV, Section 1 provides:

"Every dispute of any kind or character which may arise between the Company and the union or the employees shall be deemed to be a grievance and shall be handled in accordance with the procedures set forth in this agreement."
(Record, p. 1172B).

**5.** Section 301, 29 U.S.C. Section 185(a) provides in pertinent part:
"Sec. 185. Suits by and against labor organizations
(a) Venue, amount, and citizenship
Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

necessarily imply that conflicting state rules of law must yield to federal law. *Farmer v. Carpenters* (1977), 430 U.S. 290, 295, 97 S.Ct. 1056, 1061, 51 L.Ed.2d 338; *Vaca v. Sipes* (1967), 386 U.S. 171, 178–9, 87 S.Ct. 903, 910–11, 17 L.Ed.2d 842 (quoting *San Diego Bldg. Trades Council v. Garmon* (1959), 359 U.S. 236, 242, 79 S.Ct. 773, 778, 3 L.Ed.2d 775). On the other hand, because Congress has remained silent regarding the scope of federal preemption of state law, the Supreme Court has not declared preempted all state laws or regulation "that touches or concerns in any way the complex interrelationships between employees, employers and unions...." *Farmer, supra,* 430 U.S. at 296, 97 S.Ct. at 1061; and *Motor Coach Employees v. Lockridge* (1971), 403 U.S. 274, 289, 91 S.Ct. 1909, 1919, 29 L.Ed.2d 473. In an attempt to clarify the preemptive effect of federal labor law, the courts have engaged in a balanced inquiry into such factors as the nature of the federal and state interests in regulating the activity at issue. *Farmer,* 430 U.S. at 300, 97 S.Ct. at 1063. As the Supreme Court noted in *Vaca v. Sipes, supra,* the cases "demonstrate that the decision to preempt federal and state court jurisdiction over a given class of cases must depend upon the nature of the particular interests being asserted and the effect upon the administration of national labor policies of concurrent judicial and administrative remedies." 386 U.S. at 180, 87 S.Ct. at 911.

With specific regard to the preemptive effect of Section 301 of the Labor Management Relations Act, Congress has not explicitly addressed whether and to what extent it intended that Section 301 preempt conflicting state law. *Allis-Chalmers, supra,* 105 S.Ct. at 1910. Thus, the task of defining the preemptive scope of Section 301 has been undertaken by the courts. Ordinarily, the court will sustain a state law or regulation "unless it conflicts with federal law or would frustrate the federal scheme, or unless the courts discern from the totality of the circumstances that Congress sought to [exclusively] occupy the field...." 105 S.Ct. at 1910 (quoting *Malone v. White Motor Corp.* (1978), 435 U.S. 497, 504, 98 S.Ct. 1185, 1190, 55 L.Ed.2d 443).

The Supreme Court first analyzed the preemptive effect of Section 301 in *Teamsters v. Lucas Flour* (1962), 369 U.S. 95, 103, 82 S.Ct. 571, 576, 7 L.Ed.2d 593. The Court stated that Congress intended that federal labor law uniformly prevail over inconsistent state law. 369 U.S. at 104, 82 S.Ct. at 577. The Court further specified why federal law should govern the meaning given to terms in a collective bargaining agreement when it stated:

"[T]he subject matter of Section 301(a) 'is peculiarly one that calls for uniform law.' ... The possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements. Because neither party could be certain of the rights which it had obtained or conceded, the process of negotiating an agreement would be made immeasurably more difficult by the necessity of trying to formulate contract provisions in such a way as to contain the same meaning under two or more systems of law which might someday be invoked in enforcing the contract. Once the collective bargain was made, the possibility of conflicting substantive interpretation under competing legal systems would tend to stimulate and prolong disputes as to its interpretation ... [and] might substantially impede the parties' willingness to agree to contract terms providing for final arbitral or judicial resolution of disputes." *Id.* at 103–4, 82 S.C.t at 576–7. Consequently the *Lucas Flour* Court held that a suit which alleges a violation of a provision of a labor contract must be brought under Section 301 and resolved by reference to federal law. *Id.*[6]

---

**6.** In *Charles Dowd Co. v. Courtney* (1962), 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483, the Supreme Court said that state courts have concurrent jurisdiction in Section 301 cases. However, where state law is clearly preempted by the National Labor Relations Act under *Garmon, supra,* the state courts lack the power to adjudicate the claims that trigger preemption. *International Longshoremen's Assoc. v. Davis*

Most recently in *Allis-Chalmers Corp. v. Lueck, supra,* the Supreme Court endeavored to further define the preemptive effect of Section 301. In *Allis-Chalmers Lueck,* an Allis-Chalmers employee, brought a state tort action against Allis-Chalmers and Aetna, the disability insurance carrier, for breach of a duty of good faith in handling his disability claim rather than filing a grievance pursuant to the parties' collective bargaining agreement. The court in *Allis-Chalmers* recognized:

"If the policies that animate Section 301 are to be given their proper range, however, the pre-emptive effect of Section 301 must extend beyond suits alleging contract violations. These policies require that the relationships created by [a collective bargaining] agreement be defined by application of 'an evolving federal common law grounded in national labor policy.'

The interests in interpretive uniformity and predictability that require that labor-contract disputes be resolved by reference to federal law also require that the meaning given a contract phase or term be subject to uniform federal interpretation. Thus, questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort. Any other result would elevate form over substance and allow parties to evade the requirements of Section 301 by re-labeling their con-

tract claims as claims for tortious breach of contract."

*Id.* at 1911 (citations omitted). Not every dispute, however, which concerns an employment relationship, or tangentially involves a collective bargaining provision is preempted by Section 301 or federal labor law. *Id.* Furthermore, it would be inconsistent with congressional intent to permit Section 301 to preempt state rules that proscribe conduct or establish rights and obligations that are wholly independent of the underlying collective bargaining agreement. Accordingly, the *Allis-Chalmers* court noted that rights and obligations that do not exist independently of private agreements, and that, as a result, can be waived or altered by agreement of the parties, are preempted. *Id.* at 1912.[7] Hence the relevant inquiry in Section 301 preemption cases is whether the state tort action is based on a violation of rights or duties conferred on the parties independently of any underlying contract, or whether the tort action is inextricably intertwined with the terms of the underlying labor agreement. Intertwined in that inquiry is an examination of the kind of relief a claimant is seeking to assert. If a state rule or regulation merely purports to define terms within or obligations created by the collective bargaining agreement, the rule or regulation is preempted.[8]

■ We believe Jovanovich's claim for intentional injury is not sufficiently intertwined with the parties' collective bargaining agreement to justify Section 301 preemption. Further, the significant factual differences between the present case and *Allis-Chalmers* support our holding that Jovanovich's claim is not preempted by Sec-

(1986), —— U.S. ——, 106 S.Ct. 1904, 90 L.Ed.2d 389.

7. Later cases since *Allis-Chalmers* have agreed with this result. *Michigan Mut. Ins. Co. v. United Steel Workers* (6th Cir.1985), 774 F.2d 104; *Hechler v. Electrical Workers* (11th Cir.1985), 772 F.2d 788; and *Mitchell v. Pepsi Cola Bottlers, Inc.* (7th Cir.1985), 772 F.2d 342.

8. The holding in *Allis-Chalmers,* however, is not without limits. The Court noted at 105 S.Ct. 1916:

"It is perhaps worth emphasizing the narrow focus of the conclusions we reach today. We pass no judgment on whether this suit

also would have been pre-empted by other federal laws governing employment or benefit plans. Nor do we hold that every state-law suit asserting a right that relates in some way to a provision in a collective-bargaining agreement, or more generally to the parties to such an agreement, necessarily is pre-empted by Section 301. The full scope of the pre-emptive effect of federal labor-contract law remains to be fleshed out on a case-by-case basis."

tion 301. First, Jovanovich's claim that National Can intentionally injured him is essentially one grounded in common law while Lueck's claim in *Allis-Chalmers* was a product of the contract itself.[9] Unlike Jovanovich, Lueck would have no cause of action if the underlying insurance contract did not exist. Further, the collective bargaining agreement in *Allis-Chalmers* provided a remedy for Lueck's claim of breach of contract, namely, arbitration. However, while the parties' agreement stated that any employer-employee dispute should be filed as a grievance, Jovanovich's claim for damages arising from personal injury caused by his employer's intentional conduct was not specifically addressed or contemplated by the parties' collective bargaining agreement. The most important distinction, perhaps, is that Lueck's claim in *Allis-Chalmers* necessarily required substantial interpretation of the contract. Jovanovich's claim, on the other hand, requires only an examination of National Can's actions in light of its duties under the tort law of this state. These distinctions require that we find that Jovanovich's claim is not "substantially dependent" upon the parties' collective bargaining agreement as is required for preemption under *Allis-Chalmers*. Jovanovich's claim is not preempted by Section 301 of the Labor Management Relations Act.

Next, National Can argues that the trial court lacked subject matter jurisdiction in that Jovanovich's claim was essentially an unfair labor practice claim within the primary jurisdiction of the National Labor Relations Board (NLRB) pursuant to Section 8 of the National Labor Relations Act, 29 U.S.C. Section 158(a).[10] We believe that

---

**9.** We believe that Jovanovich asserted at least two possible claims: one for intentional injury, and the other based on the employer's retaliatory practices in breach of the parties' collective bargaining agreement. If Jovanovich had pursued the latter, such action would clearly be preempted by federal law. *Vantine v. Elkhart Brass Mfg. Co.* (7th Cir.1985), 762 F.2d 511, 517.

**10.** Section 8 provides in pertinent part:
"Sec. 158. Unfair labor practices
(a) Unfair labor practices by employer
It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it; *Provided,* That subject to rules and regulations made and published by the Board pursuant to section 156 of this title, an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay;
(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization; *Provided,* That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 159(a) of this title in the appropriate collective-bargaining unit covered by such agreement when made, and (ii) unless following an election held as provided in section 159(e) of this title within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement; *Provided further,* That no employer shall justify any discrimination against an employee for non-membership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;
"(4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this sub-chapter;
(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."
Further, as a general rule, the federal question must appear on the face of the complaint to justify removal to federal court, and whether a complaint presents such a federal question depends on the theory of recovery advanced in a plaintiff's well-pleaded complaint. *Franchise Tax Bd. v. Construction Laborers* (1983), 463

the trial court was correct in determining that Jovanovich's tort claim was not governed by Section 8.

## II. Preemptive Scope of Section 8

■ The United States Supreme Court in *San Diego Bldg. Trades Council v. Garmon* (1959), set forth the general rule regarding the primary jurisdiction of the NLRB in Section 8, unfair labor practice claims, when it stated:

"When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by Section 7 of the National Labor Relations Act, or constitute an unfair labor practice under Section 8, due regard for the federal enactment requires that state jurisdiction must yield. To leave the States free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress, and requirements imposed by state law."

359 U.S. 236, 244, 79 S.Ct. 773, 779, 3 L.Ed.2d 775.[11] The Supreme Court, however, has refused to preempt activity which would arguably fall within the reach of the *Garmon* rule if that activity "was a merely peripheral concern of the Labor Management Act ... [or] touched interests so deeply rooted in local [state] feeling and responsibility that, in absence of compelling congressional direction, [the court] could not infer that Congress had deprived the States of the power to act." *Id.* at 243–4, 79 S.Ct. at 779; *see, e.g., Farmer v. Carpenters, supra,* 430 U.S. at 296–7, 97 S.Ct. at 1061 (violent threats, harassment and hiring hall discrimination); *Linn v. Plant Guard Workers* (1966), 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (malicious libel); *Auto Workers v. Russell* (1958), 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (mass picketing and libel); and *Machinists v.*

*Gonzales* (1958), 356 U.S. 617, 78 S.Ct. 923, 2 L.Ed.2d 1018 (wrongful expulsion from union membership).

A number of factors have led the court to recognize exceptions to the *Garmon* preemption rule. The Court in *Linn, supra,* considered several factors in finding an exception to federal preemption: (1) the conduct complained of was not protected under the Act; (2) there was no risk that allowing a state cause of action would result in state regulation of conduct that Congress intended to protect; (3) there exists "an overriding state interest" in protecting its residents from harm and this state interest was "deeply rooted in local feeling and responsibility;" and finally (3) there is little risk that the state cause of action would interfere with effective administration of uniform national labor policy. 383 U.S. at 61, 86 S.Ct. at 662. Our examination of these factors in the present case requires that we find that Jovanovich's tort claim is outside the preemptive reach of Section 8.

The National Labor Relations Act does not protect against, nor does it address, the direct personal consequences of tortious employer misconduct which causes physical and emotional harm to an employee. The Act's failure to address this problem makes apparent that there is no risk that allowing Jovanovich's claim would encroach upon an area which Congress intended to occupy exclusively. Even if a minimal risk of such a conflict existed, that risk would be substantially outweighed by the state's substantial interest in controlling tortious behavior and protecting its citizens. Further, there is no interest more "deeply rooted in local feeling and responsibility" than a state's interest in protecting its citizens from physical and mental harm. Lastly, in light of the fact that Jovanovich's claim can be adjudicated without regard to the merits

U.S. 1, 9–12, 103 S.Ct. 2841, 2846–48, 77 L.Ed.2d 420. A plaintiff may not avoid federal jurisdiction by "artfully pleading" his claim as a state law claim when such claim is in substance a federal question. *Mitchell v. Pepsi Cola* (7th Cir.1985), 772 F.2d 342, 344. We believe that Jovanovich's complaint does not present a fed-

eral question. Hence, the "artful pleading" doctrine does not apply to the present case.

**11.** The *Garmon* rule was recently reaffirmed in *International Longshoremen's Assoc. v. Davis* (1986), —— U.S. ——, 106 S.Ct. 1904, 90 L.Ed.2d 389.

of the underlying labor controversy, there is no risk of interference with effective administration of a uniform national labor policy. Consequently, we find that Jovanovich's tort claim is not preempted by Section 8 and is not within the jurisdiction of the NLRB.

### III. Workmen's Compensation Exclusivity Provision and an Intentional Injury Exception

 Finally, National Can asserts that Jovanovich is limited to recovery under the Indiana Workmen's Compensation Act pursuant to the Act's exclusivity provision, IC 22–3–2–6, which provides:

> "Exclusive remedies
>
> Sec. 6. The rights and remedies granted to an employee subject to IC 22–3–2 through IC 22–3–6 on account of personal injury or death by accident shall exclude all other rights and remedies of such employee, his personal representatives, dependents or next of kin, at common law or otherwise, on account of such injury or death, except for remedies available under IC 16–7–3.6." [12]

Both National Can and Jovanovich agree that Jovanovich's injuries arose during and out of his employment with National Can. The parties' dispute, however, is whether Jovanovich's injuries were "by accident" as required by IC 22–3–2–6 set forth above and hence, within our Workmen's Compensation Act.

In support of its claim that Jovanovich's injuries were "by accident" National Can relies upon *Evans v. Yankeetown Dock Corp.* (1986), Ind., 491 N.E.2d 969. In *Yankeetown* the Supreme Court held that the statutory term "by accident" refers to an unexpected injury rather than an unexpected event causing injury. The court in *Yankeetown* stated:

> "IC 22–3–2–6 excludes all rights and remedies of an employee against his employer for personal injury or death *if the following three statutory jurisdictional prerequisites are met:*

> A. Personal injury or death by accident;
>
> B. Personal injury or death arising out of employment;
>
> C. Personal injury or death arising in the course of employment.
>
> Actions for employee injuries or death *which do not meet each of these prerequisites are not excluded and may be pursued in the courts."*

491 N.E.2d at 973 (emphasis added).

The focal point of the court's decision in *Yankeetown* was whether some untoward event must be established as causing the injury (an accident) or whether it was sufficient that an injury unexpectedly resulted from some activity in the course and scope of the employment.

Jovanovich's argument seeking to transpose the court's analysis to force the conclusion that whenever an employee expects or anticipates an injury, he is outside the act is unwarranted. Such injuries may nevertheless arise "by accident" within the meaning of the statute.

On the other hand both the plain language of the compensation statute and the opinion in *Yankeetown* recognize that if an employer intentionally injures an employee, the Act does not apply.

Public policy reinforces this conclusion since it would be a total perversion of the humanitarian purposes of the Act to permit an employer to use the Act as a shelter against liability for an intentional tort.

Thus, the trial court had jurisdiction to entertain Jovanovich's claim alleging an intentional tort.

### IV. Specific Intent Requirement

 While we find that Jovanovich's claim is beyond the scope of the Workmen's Compensation Act, it nevertheless must fail, as a matter of law, for failure to satisfy the specific intent requirement necessary to prevail on a claim of intentional employer misconduct outside the operation of the statute. While it must be proven that the supervisory employee acted as the

---

12. IC 16–7–3.6–1 et seq. deals with compensation to victims of violent crimes.

alter ego of the corporation or acted upon direct orders from those in control of the corporation,[13] it must also be proven that the employer had an actual intent to cause the harm complained of.[14] As the courts in *Cunningham v. Aluminum Co. of America, Inc.* (1981), Ind.App., 417 N.E.2d 1186, *Blade v. Anaconda Aluminum Co.* (1983), Ind.App., 452 N.E.2d 1036 and *Tribbett v. Tay Mor Industries, Inc.* (1984), Ind.App., 471 N.E.2d 332 noted, Dean Prosser distinguished the requisite specific intent underlying an intentional tort and negligence:

"[T]he mere knowledge and appreciation of a risk, short of substantial certainty, is not the equivalent of intent. The defendant who acts in the belief of consciousness that he is causing an appreciable risk of harm to another may be negligent, and if the risk is great his conduct may be characterized as reckless or wanton, but is not classed as an intentional wrong. In such cases the distinction between intent and negligence obviously is a matter of degree. Apparently the line has been drawn by the courts at the point where the known danger ceases to be only a foreseeable risk which a reasonable man would avoid, and becomes a certainty."

*Cunningham, supra* at 1190; *Blade, supra* at 1038; and *Tribbett, supra* at 333 (citations omitted).

There is a causative factor involved that is closely equated with this intent analysis. Assuming that the actor, here the employer, subjectively harbors an actual intent that an injury occur, the nexus between the actor's *conduct* and the resultant injury must be one of substantial certainty for an intentional tort to occur. Most frequently in contexts such as the one before us, that nexus is destroyed because the "victim" is left with the choice of whether to engage in the hazardous activity. He may refuse to work in the dangerous environment, to lift the heavy object, to make the delivery in a high crime area after dark, etc. If he does engage in the assignment and is injured in consequence, he may be entitled to recover under worker's compensation laws, or for common law negligence or recklessness where the relationship is not governed by

**13.** We see no problem in holding the employer liable for torts he directs or expressly authorizes against his employees. There, the employer acts with such personal moral culpability that he must be held responsible. Courts fail, however, to explicitly distinguish those cases from incidents where the intentional tort is committed not by the employer personally, but by a foreman or supervisor. Although the foreman may be personally at fault, it does not follow that his moral culpability can be shifted to the employer by simple reliance on the doctrine of *respondeat superior.* It must be shown that the actor was the employer, one acting pursuant to employer's direct order or one acting as the alter ego of the corporation. 2A, A. Larson, *The Law of Workmen's Compensation* (1983), Section 68.22; Note, *Workmen's Compensation Expanding the Intentional Tort Exception to Include Wilful, Wanton and Reckless Employer Misconduct,* 58 Notre Dame L.Rev. 890, 899 (1983); *Heskett v. Fisher Laundry Co.* (1950), 217 Ark. 350, 230 S.W.2d 28; *Bryan v. Utah Int'l.* (Utah 1975), 533 P.2d 892; *Jablonski v. Multack* (1978), 63 Ill.App.3d 908, 20 Ill.Dec. 715, 380 N.E.2d 924; *Daniels v. Swofford* (1982), 55 N.C. App. 555, 286 S.E.2d 582.

**14.** As recognized in Larson's treatise on workmen's compensation law:

"Once a workmen's compensation act has become applicable ... it affords the exclusive remedy for the injury by the employee or his dependents against the employer and insurance carrier. This is part of the *quid quo pro* in which the sacrifices and gains of employees and employers are to some extent put in balance, for, while the employer assumes a new liability without fault, he is relieved of the prospect of large damage verdicts."

2A Larson, *supra,* Section 65.11. In light of the *quid quo pro* underlying Indiana's Workmen's Compensation Act, we believe a stringent standard of specific intent is necessary to avoid the workmen's compensation scheme being "swallowed up" by a glut of common law suits outside the Act. Such a result is inconsistent with the legislative purpose underlying our workmen's compensation statute. We realize, however, that other jurisdictions are not in accord regarding how stringent the specific intent standard should be. *See Serna v. Statewide Contractors* (1967), 6 Ariz. 12, 15, 429 P.2d 504, 508 (the most stringent standard); *Bazley v. Tortorich* (La.1981), 397 So.2d 475 (the intermediate standard adopting the definition of intent contained in Restatement (Second) of Torts Section 8A (1965)); and finally, *Mercer Fraser Co. v. Industrial Accident Comm'n.* (1953), 40 Cal.2d 102, 120, 251 P.2d 955, 964 (the most liberal standard).

worker's compensation. If he refuses the assignment he may be subjected to discipline and he may be entitled to litigate or utilize a formal grievance procedure to contest any discipline. But he is not entitled to recover on the theory of intentional tort. There is a failure of intentional causation between the actor's conduct and the victim's injury.

The record shows that both Jovanovich and National Can were fully advised, pursuant to Dr. Galea's letter, that Jovanovich could perform his "regular job" according to his tolerance for pain. Jovanovich produced testimony at trial showing National Can's animosity toward him because of his union activities, mainly filing of grievances. Jovanovich also provided substantial evidence showing National Can's desire to force Jovanovich to quit his job or to force him to withdraw certain grievances, or both. Jovanovich even presented evidence that his "heavy work" assignments came from high-level supervisors. We believe, in viewing the evidence in the light most favorable to Jovanovich, that this evidence as a matter of law fails to show either the necessary intent on the part of National Can or the direct causative connection necessary for an intentional tort. Hence we find that Jovanovich failed to satisfy the requirements necessary to successfully recover in an action outside the Workmen's Compensation Act.

The judgment is reversed.

STATON, J., concurs.

CONOVER, P.J., concurs and files separate opinion.

CONOVER, Presiding Judge, concurring.

While I agree with the majority Jovanovich should not recover, I do so for different reasons. Jovanovich had no common law cause of action for the injuries he received, even if National Can Corporation intended he should suffer such injuries. His exclusive remedy was provided by the Indiana Workmen's Compensation Act to the exclusion of all other causes of action.

IND. CODE 22–3–2–6 says in part

The rights and remedies herein granted to an employee subject to this act ... shall exclude all other rights and remedies of such employee, ... at common law or otherwise, ...

This exclusivity extends even to intentional torts. On this subject we have said

Appellants try to draw a distinction between *an intentional tort* and a negligent tort. The distinction for purposes of our Workmen's Compensation Act is unnecessary. The distinction to be drawn is whether the tort or accident arose out of and in the course of employment. (Citing case). (Emphasis supplied).

*Burkhart v. Wells Electronics Corp.* (1966), 139 Ind.App. 658, 215 N.E.2d 879, 881. *Accord, North v. United States Steel Corp.* (C.A.7, 1974) 495 F.2d 810; *Tribbett v. Tay Mor Industries, Inc.* (1984), Ind. App., 471 N.E.2d 332; *Blade v. Anaconda Aluminum Co.* (1983), Ind.App., 452 N.E.2d 1036; *Cunningham v. Aluminum Co. of America, Inc.* (1981), Ind.App., 417 N.E.2d 1186.

Further, I find nothing in the Workmen's Compensation Act authorizing suits by the employee against the employer based upon the employer's intentional injury of the employee while on the job, nor do I find such language in *Evans v. Yankeetown Dock Corp.* (1986), Ind., 491 N.E.2d 969, as does the majority. I believe it apparent the trial court had no jurisdiction of the subject matter of this action, and the trial court erred by overruling National Can's motion to dismiss. While this result may seem harsh, our clear mandate is to follow the law. Only the Legislature can make the change Jovanovich sees as necessary in cases of this nature.

Thus, I would remand this cause with directions to set aside the judgment herein and dismiss this action with prejudice.